UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

JOSH HADLEY and
MICHAEL FISHER,

    Plaintiffs,

-v-                                      Case No. 11-C-147

JOURNAL BROADCAST GROUP, INC.,

    Defendant.

**DECISION AND ORDER**

In this action Plaintiffs claim that Defendant Journal Broadcast Group (JBG) had a policy of failing to fully compensate its employees, in violation of the Fair Labor Standards Act. Presently before me is the Plaintiffs motion to conditionally certify a class to be part of a collective action pursuant to 29 U.S.C. § 216(b).

**I. FLSA Conditional Certification**

In a collective action under the FLSA, a named plaintiff sues "in behalf of himself ... and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." 29 U.S.C. § 216(b). *Harkins v. Riverboat Services, Inc.,* 385 F.3d 1099, 1101 (7th Cir. 2004). "The conditional approval process is a mechanism used by district courts to establish whether potential plaintiffs in the FLSA collective action should be sent a notice of their eligibility to participate and given the opportunity to opt in to the collective action." *Ervin v. OS Restaurant Services, Inc.,* 632 F.3d 971, 974 (7th Cir. 2011). Unlike a class action under Rule

23(b), in which potential plaintiffs are included in the class unless they opt-out, a § 216(b) collective action requires potential plaintiffs to opt-in to the suit by filing a written consent with the court.

Here, the Plaintiffs ask that this Court certify the following group of employees for inclusion in a collective action:

> All persons who are or have been employed by Defendant, Journal Broadcast Group, in Wisconsin as an hourly employee within three years prior to this action's filing date who have not received compensation for all hours of work, including overtime compensation for hours worked in excess of forty (40) in a workweek.

The conditional certification process, which occurs prior to discovery, requires plaintiffs to show that they are similarly situated to the proposed class by demonstrating the existence of a nexus of facts common to members of that class. The evidence needed has been described by other courts in this circuit as a "modest" or "minimal" showing. *Nicholson v. UTi Worldwide, Inc.,* No. 3:09–CV–722–JPG–DGW, 2011 WL 250563, at *2 (S.D.Ill. Jan.26, 2011); *Howard v. Securitas Security Servs., USA Inc.,* No. 08 C 2746, 2009 WL 140126, at *5 (N.D.Ill. Jan.20, 2009). Even so, a court will not certify a class based on the plaintiffs' say-so alone. Instead, a court will view affidavits and other evidence to determine whether plaintiffs reasonably demonstrate that they and the putative class members were victims of a corporate decision, policy or plan. *Howard,* 2009 WL 140126 at *3.

**II. The Allegations**

The Plaintiffs are former employees of Green Bay TV station WGBA, which is owned by defendant JBG, a Milwaukee-based company that owns the Milwaukee *Journal-Sentinel* newspaper and Milwaukee's WTMJ television and radio stations. Plaintiffs allege that supervisors shaved time off their records in order to prevent them from receiving overtime pay for hours worked in excess

2

of forty hours per week. They also allege that supervisors permitted or required employees to perform work "off the clock." These practices, they allege, were not just isolated events but part of a company-wide policy or plan to meet budgetary constraints.

I note at the outset that the Plaintiffs appear to be relying heavily on the fact that at this stage they are required only to make a "modest" showing of commonality. For example, their complaint contains no specific allegations at all, and they have supported their motion with a single declaration filed by a third plaintiff, Scott Murray, who has opted into the lawsuit. The declaration makes a number of conclusory allegations but lacks any detail. Similarly, Plaintiffs' briefs make only fleeting citations to snippets of the other Plaintiffs' deposition testimony, leaving the Court to read the depositions to discern whether there is any merit to the motion.

**A. Time Shaving**

To the extent it is supported at all, the allegation that JBG had a policy of not fully compensating its non-exempt employees is based on two alleged practices. First, Plaintiffs allege that JBG managers engaged in "time shaving"—a practice by which a supervisor would log in to the company's electronic payroll records system and reduce the hours the employee had actually recorded. Plaintiff Hadley testified that he had a contentious relationship with his supervisor, Karen Kvitek, partly over the fact that she would occasionally edit the time he had submitted. (ECF No. 19, Ex. 8 at 32.) He stated that he would often find that she had edited fifteen minutes off of his time entries.

Plaintiff Fisher testified that he believed his supervisor, Bob Healey, shaved time on occasion. Fisher also overheard other employees suggesting that the station's general manager, Guyanne Taylor, might have been involved as well. (ECF No. 19, Ex. 7 at 123:15-25.) Even apart from the hearsay, Fisher's testimony on these points was exceedingly vague. When asked how

3

many times he believed his own time had been shaved, he said, "I can't say for sure, I believe it was multiple." (*Id.* at 193:3-5.) He could not say either how many times his time had been edited, nor how much time he thought he'd lost. (*Id.* at 193:7-11.) The plaintiff who opted in, Scott Murray, filed a declaration vaguely asserting that there had been "several instances" in which his time cards were edited by Karen Kvitek. (ECF No. 18 at 13.)

Although Hadley possibly states a claim based on his allegation that Kvitek, his supervisor, frequently edited his time entries, there is no commonality to the allegations because the assertions of the other two Plaintiffs are painfully vague and wholly unsupported. Even accepting the Plaintiffs' allegations as true, their suggestions that time might have been cut on an unspecified number of occasions over an undefined period of time do not give any basis for certifying a *collective* action.

When the Defendant's side of the story is heard, it becomes even clearer that there is no merit to the allegations at all. First, Plaintiffs' brief argues that the time shaving resulted in employees not receiving overtime pay they were due, but this assertion is not supported by the depositions. Plaintiff Hadley testified that he typically worked only 35 hours per week, and he provided no examples of how shaving a few minutes here and there would have impacted his eligibility for overtime. Plaintiff Fisher provided no testimony to that effect either. Although he often worked more than forty hours per week, he did not know how many times his time entries had been modified, and it appears it was in fact a very rare occurrence. Plaintiffs' brief cites his deposition testimony for support, but the cited testimony merely describes a discussion Fisher had with other employees. (ECF No. 19, Ex. 7 at 69:3-5.) For his part, opt-in Plaintiff Murray stated that there had been "several instances" in which time-shaving reduced his hours below forty. (ECF No. 18 at ¶ 13.) But "several" could mean fifty or it could mean two; we are not told. Regardless,

4

the Defendant helpfully points out that the total number of hours "shaved" from Murray's records was roughly one hour per month, and none of those edits brought him below the forty-hour overtime threshold, the sole exception being when Murray had accidently entered "a.m." instead of "p.m." on two separate occasions. (ECF No. 26, ¶ 9.) Thus, I cannot conclude that there is any evidence whatsoever that JBG had a policy or program of reducing employees' time to bring them under the overtime cutoff.

Plaintiffs' brief also asserts that the time shaving was "perpetrated" by a number of supervisors, which, if true, could be suggestive of a corporate policy or plan and thus commonality. But there is simply nothing in the deposition testimony that indicates a broad-based program involving a number of supervisors. Almost all of the time-shaving allegations involve a single supervisor, Karen Kvitek. On a few discrete occasions, supervisor Bob Healey is alleged to have edited employees' time. Plaintiffs try to link Guyanne Taylor, the station's general manager, to the time-shaving allegation, but her involvement is quite limited. Plaintiff Hadley testified that he "believed" Taylor had edited his time entries. (ECF No. 19, Ex. 8 at 43:6.) Taylor admits that on one occasion she did edit Hadley's time entry:

> On August 23, 2010, I made an edit to Josh Hadley's time entry for August 22, 2010. I changed the "time out" from 11:00 p.m. to 10:45 p.m. based on an email I received from James Pelon, a director at WGBA, which stated that all production employees, except for one (not Hadley), clocked out on August 22, 2010 at 10:45 p.m. . . . I sent Josh Hadley an email on August 23, 2010 telling him about the change I had made to his August 22, 2010 time and asking him to contact me if he disagreed with the edit I made. Mr. Hadley responded "I entered that when it looked like the game was going over, and I forgot to go back and change it."

(ECF No. 27 at ¶¶ 10-11.)

Given the fact that Taylor made a single, fifteen-minute edit, and given that the edit was an entirely appropriate response to Hadley's own error, the Plaintiffs' effort to link Taylor to the time-

5

shaving allegations smacks of desperation. The fact is that there is nothing in the record even *suggestive* of a policy or program designed to reduce employees' time after it was submitted. Instead, it appears a single supervisor may have edited several employees' time records in small amounts over long periods of time. As such, I could not certify any sort of collective action based on "time-shaving" because there would seem to be very few individuals in the proposed class who would have experienced what these Plaintiffs allege they experienced.

**B. Working "Off the Clock"**

The other allegation supporting the Plaintiffs' claim for certification is that management had a policy of requiring employees to perform work off the clock. Hadley testified that Kvitek told him roughly a hundred times that various tasks she wanted him to do would be "off the clock," although she did not use those exact words. (ECF No. 19, Ex. 8 at 142-143.) He also testified that on two occasions Bob Healey asked him to do things off the clock. (*Id.* at 144.) These occasions involved staying ten or fifteen minutes late on certain discrete projects. (*Id.*) Hadley also testified that he attended many meetings that might have begun five minutes prior to his actual start time. (*Id.* at 82-83.) Hadley estimated that he worked off the clock thirty minutes to an hour per week. (*Id.* at 146:6-7.) Plaintiff Fisher testified that on one occasion he put in for time he had worked at home, but Bob Healey told him he would not be paid for that. (ECF No. 19, Ex. 7 at 60:11-14.) Plaintiff Murray stated that his supervisors told him he was required to create story ideas on his own time, but when he attempted to record that time Kvitek told him he could not do so. (ECF No. 18 at ¶ 10.) Many of these allegations involve *ad hoc* projects and random events that are not suggestive of any kind of company policy. The only potential claim that could give rise to a collective action involves the Plaintiffs' common allegation that they were asked to bring story ideas to the office with them.

6

Hadley testified that Kvetik told him he should bring story ideas to meetings even though he was a production specialist, and thus not technically responsible for generating stories. Generating story ideas would presumably be done at home (watching television, reading the internet, etc.) prior to his shift. (ECF No. 19, Ex. 8 at 84.) Fisher stated that Bob Healey told him he should bring story ideas to work with him, and Fisher therefore felt that he was required to read news stories on the internet prior to his shift. (*Id.*, Ex. 7 at 162-175.) Murray also stated that he was supposed to come to work with story ideas. (ECF No. 18, ¶ 7.)[1]

These allegations suffer from a similar lack of support. At the outset, I note that in many places the Plaintiffs' brief alleges that the company "allowed" employees to work off the clock. The work the company allegedly "allowed" them to do off the clock, however, consisted of thinking, i.e., coming up with ideas for stories. Merely "allowing" employees to work on their own time is something that presumably every company in the country does, at least when the off-the-clock work is the kind of creative work at issue here. Thinking about the job when not at work is both hard to stop and hard to monitor. In any event, to the extent the allegation is that the company had a policy *requiring* employees to work without pay, the allegations are so individualized that there would not likely be any common answers achieved through collective litigation.

Although these allegations are similar in that they suggest a larger managerial directive that employees bring ideas into the office, they do not suffice to justify the certification of a collective action. First, assuming there *was* such a directive, there is no evidence that any supervisors explicitly told employees to do any "work" off the clock, at least in the traditional sense. For example, if a number of supervisors had directed employees to research specific news stories, make

---

[1] There are other *ad hoc* allegations involving small amounts of work off the clock, but they lack any suggestion of commonality at all.

phone calls, interview witnesses, or drive to locations, there might be a sounder basis for a claim. But directing employees to bring story ideas to work is hardly a specific demand that an employee work without compensation. Instead, it is a request that employees be well-versed in the news and be ready to contribute to the creative process. As the Plaintiffs' depositions reflected, it would be difficult to record time for the vague directive to bring story ideas to work, primarily because in many cases employees are doing little more than surfing internet websites and watching TV news— the kinds of things that most people in the news business presumably would do anyway. It is not, in short, the kind of work that lends itself to compensation because a substantial portion of the time spent would be better classified as "personal" rather than "work."

But to the extent it was actual "work," the vagueness of the directive to generate story ideas means that would be difficult to pursue such a claim collectively because each affected employee would have interpreted and acted on the directive differently. The three Plaintiffs' own experience makes this clear, as each one spent different amounts of effort attempting to produce story ideas for one or more supervisors. (And of course there is no way to verify how much time an employee would have spent on such matters.) Assuming there was a broader company policy or plan in place, each employee's own subjective interpretation of his supervisor's directive would require an individualized, rather than common, approach. Such a claim stands in stark contrast to a more typical FLSA claim, where the employment practice is a commonly shared (and more easily measured) experience. *See, e.g., DeKeyser v. Thyssenkrup Waupaca, Inc.,* 2008 WL 5263750 (E.D. Wis., December 18, 2008) (time spent "donning and doffing gear and equipment, showering, and walking to and from the production floor.")

Finally, I am satisfied that this case is not appropriate for certification because there is almost no indication that any other employees either were affected by these alleged practices or,

8

if they were, that they are interested in joining this action. First, there has been no evidence that there was any widespread policy at all, much less one stretching to all employees of JBG. Instead, at most the Plaintiffs have offered their own idiosyncratic experiences working for a number of different supervisors, all while employed at WGBA rather than throughout the company. Relatedly, there has been almost no indication of interest from other employees since this lawsuit was filed more than a year ago. Plaintiffs have testified that they talked to numerous other people about joining this lawsuit. Hadley, in particular, testified that he talked to many recently terminated employees about joining the lawsuit and gave out his attorney's phone number, but none of them have joined or called. (ECF No. 19, Ex. 8 at 185-190.) In addition, an email from another employee (a union steward) asserts that members who were contacted by Hadley want "NO PART" (sic) of the lawsuit. (ECF No. 27, Ex. B.)

If FLSA violations were as widespread as Plaintiffs allege, one would expect that more than one person would have joined the lawsuit by now. *Cf. DeKeyser,* 2008 WL 5263750 at *5 ("As sixty-seven individuals have already opted into this litigation prior to the dissemination of any court-approved notice, there is a sufficient interest in the litigation to support conditional certification.") In truth, however, it should not come as a surprise that there has not been a stampede to join this case. The time-shaving issues described above, even if true, are essentially nickel and dime allegations that could not be expected to generate interest in participating in a federal lawsuit. As for the "off the clock" issue, it is possible that other employees simply were less offended by the suggestion that they bring creative ideas into the workplace. Regardless of the reason, a demonstrable lack of interest in a collective action is a strike against certification. *Simmons v. T-Mobile USA, Inc.*, No. H-06-1820, 2007 WL 210008, at *9 (S.D.Tex. Jan.24, 2007) ("[o]thers' interest in joining the litigation is relevant to whether or not to put a defendant employer

9

to the expense and effort of notice to a conditionally certified class of claimants."); *Dybach v. State of Florida Department of Corrections,* 942 F.2d 1562, 1567 (11th Cir. 1991) ("the district court should satisfy itself that there are other employees of the department-employer who desire to 'opt-in'"). Here, there is sufficient evidence that numerous potential plaintiffs made no effort to join the lawsuit when informed about it. This counsels against certification.

**III. Conclusion**

For the reasons given above, I conclude that this case is not a good candidate for certification as a collective action. Accordingly, the motion to certify is **DENIED**. The Clerk is directed to set this matter on the Court's calendar for a telephone conference to address further scheduling.

**SO ORDERED** this   15th   day of February, 2012.


　　　　　　　　　　　　　　　　　　 s/ William C. Griesbach
　　　　　　　　　　　　　　　　　　William C. Griesbach
　　　　　　　　　　　　　　　　　　United States District Judge